I concur. By a divided court the award on the first review was annulled because of the finding of the commission that the loss of the applicant's finger and the loss of function of his hand and for which he claimed and was awarded compensation were the result of a severe infection due to the refusal of the applicant to permit proper medical and surgical treatment. The applicant on sustaining an injury was given first aid by a physician at Murray and then was directed to report the next day for examination and treatment to the chief surgeon of the employer at Salt Lake City but six or seven miles away. The applicant did so, not on the next day, but the day thereafter. The chief surgeon examined the lacerated and injured fingers, took an X-ray *Page 309 
of them, and found a compound fracture of the middle finger of the hand. He then undertook to remove devitalized tissue and such foreign matter as might be present, cleansed the affected parts, and reduce the fracture. To that the applicant objected and did not permit the chief surgeon to do so. The necessity to do that was fully explained to the applicant and the evil effects likely to follow if that was not done. Notwithstanding the explanation, the applicant did not permit any kind of treatment except application of wet dressings. He was told that, if he did not desire the chief surgeon to treat the case, he was privileged to select any physician and surgeon he might desire. That was also rejected. The chief surgeon also advised him that, unless he permitted proper and necessary treatment, he would not be responsible for any complications or ill effects that might result. So, to protect the surgeon, the applicant voluntarily signed a written statement that "I refuse to allow Dr. Pugh (the chief surgeon) or any other doctor to reduce the fracture of my finger and give what treatment is necessary to improve the deformity and prevent possible complications," either with or without an anesthetic. Thus, the only treatment the surgeon was permitted to give was the application of wet dressings. Even as to that, the applicant did not report as frequently and at such times as he by the doctor was asked to do.
The chief surgeon first saw the applicant on the 9th of February, two days after the injury. He saw him two or three times after that. Each time the applicant refused to be treated as the doctor desired to treat him. On the night of the 14th, or the early hours of the 15th, another physician was called at the house of the applicant who found him suffering from a severe infection and removed him to a hospital, where, on the next day or the day thereafter, the applicant's finger was amputated. Notwithstanding the finding of the commission on the first hearing that the infection was the result of the refusal of the applicant to be properly treated, the commission granted him an award for the loss of his *Page 310 
finger and loss of function of the hand, on the theory that his refusal was due to timidity and an oversensitiveness to pain, although it indisputably was shown that the surgeon offered to have a proper anaesthetic administered if the applicant desired it. It also was shown and not disputed that the treatment offered to be given the applicant was a proper treatment.
After the award was annulled by us, the commission, over the objection of the employer, granted the applicant a rehearing. On that hearing the record of all the evidence and of all the proceedings had on the first hearing was put in evidence. The chief surgeon of the employer was again called as a witness. His testimony in every material respect was the same on that hearing as it was on the first and again explained the condition of the injury when he first saw it, the necessity of cleansing the affected parts, removing the devitalized tissues and all foreign matter that might be present, and to reduce the fracture and the complications likely to follow if that was not done. The evidence as to the refusal of the applicant to permit the chief surgeon to give him any treatment except the application of wet dressings was the same on the second as it was on the first hearing.
No testimony was given by the applicant himself on the second hearing. The record merely of his testimony on the former hearing was put in evidence. No other evidence was adduced by him other than the evidence adduced on the former hearing, except two physicians called by him who were not called and who gave no testimony on the first hearing. Neither of them saw the wound or knew anything about it. No history of the case was given them, nor as to the character of the injury, other than as stated in a hypothetical question submitted to them. The hypothetical question was as follows:
"Assuming Doctor that an individual had a compound fracture of the middle of the large finger, and that fracture was treated and dressed, and set according to the best skill and treatment by a reputable *Page 311 
physician, and then the hand at the time of the fracture was dirty and grimy, and the flesh considerably lacerated, and then a couple of days later this patient should call upon a reputable physician and surgeon and he should dress it the best he knew how, but that he found that the fracture of the bones had not been properly set and he had attempted to set the bones at that time and the patient refused to permit him to reduce the fracture, and that he called the next day and had that finger dressed by that physician, and he called the following day again and intermittently thereafter for a week he called and had it dressed, and seven days after the injury that infection had developed to such a serious stage in his hand that it was necessary to amputate the finger, what would you say caused the infection?"
In a number of particulars, the hypothetical question does not embody the material facts of the case, and in some particulars embodied facts concerning which there is no evidence. The statement "that the fracture was treated and dressed," according to the best skill and treatment of a reputable physician, refers to first aid treatment rendered by the physician at Murray, but is not in accordance with the fact. All such physician did was to render first aid and send the applicant for examination and treatment to the chief surgeon at Salt Lake City. Nor is the statement that a couple of days later the applicant called on a physician (the chief surgeon) "who dressed the injury and fracture the best he knew how," for that the evidence indisputably shows that the chief surgeon was not, because of the refusal of the applicant, permitted to give proper or necessary treatment or any treatment except the application of wet dressings. In other words, the hypothetical question eliminated the all-important element that the applicant without dispute refused to permit the chief surgeon to give proper and necessary treatment; that he not only refused to permit the fracture to be reduced, but also refused all other proper or necessary treatment to be given and as was voluntarily stated by him in his written statement, or to permit the surgeon to do anything except to apply wet dressings. But, upon the submitted hypothesis, the physician called was asked, "What would you say caused the infection?" *Page 312 
The witness, after stating what he regarded "the problem to be," and by "assuming that we had to begin with an open wound with grime and dirt in it and a period of seven days had elapsed before the infection set in," to which counsel for the applicant stated, "before the finger had developed to such a stage" as was necessary to amputate it, and stating to the witness that he was permitted to "recite the facts and answer the question so that you are clear in your mind," finally answered that the infection "might very properly have been due to infection at the time of the injury." Of course, had there been no injury, there would not have been an infection. But that was not the real point in controversy. The question is, Had the applicant permitted proper and necessary treatment, could or would the infection have been avoided or arrested, no infection having been present when the chief surgeon first saw the case? The chief surgeon testified that in forty-nine cases out of fifty there would not have been any infection developed, or any necessity of amputating the finger, or any loss of function of the wrist or hand, had the applicant permitted proper and necessary treatment to be given him. Indeed, there is no substantial conflict in the evidence as to that. The physicians called by the applicant did not testify nor even intimate that with proper and necessary treatment the infection could not or probably would not have been avoided or arrested. To the contrary, the first physician called by the applicant in part testified that the important thing, in such a wound as described to and stated by him, was treatment against possible infection; that the reduction of the fracture was an important element; that the first thing to be done was the elimination of everything which was a predisposing cause to an infection, including cleansing and sterilizing the wound, and that displacement of the bone would be a predisposing cause to an infection, for "a displacement might be an important disturbance in the wound." The other physician called by the applicant, in substance, testified to the same matters as testified to by the first physician. *Page 313 
So, while additional testimony of such physicians, and only such additional evidence, was adduced at the second hearing, yet it in substance was not such as to justify or permit a finding contrary to the finding made by the commission on the first hearing to the effect that the refusal of the applicant to permit proper medical and surgical treatment resulted in a severe infection necessitating amputation of his finger and the loss of function in his left hand or wrist. The commission on the second hearing made rather complete findings on all the issues, except as to the real issue in controversy. Though specifically found with respect thereon on the first hearing, the commission failed or avoided to do so on the second hearing. If the evidence on the second hearing had been materially different from that on the first hearing so as to justify a finding that the loss of the applicant's finger and loss of function of his hand for which he was awarded compensation were not the result of his refusal to be properly treated, then, let it be assumed, the award should be upheld, though no specific finding was made as to the result or effect of such refusal. But I find no such difference in the evidence of the two hearings, nor did the commission find that there was any such difference. It merely on this hearing avoided making any finding on the subject — the real controverted issue — on which the commission so specifically and definitely made a finding on the first hearing and on which the award was by us annulled. It may be that on the record the commission felt that, if it again found on the subject, it could not well find other than or different from the finding made on the first hearing, and so de bonne grace made none, and thereby may have thought to destroy the effect of its finding in such particular made on the first hearing, but which finding, together with all other record proceedings of the first hearing, were wittingly or unwittingly, by the commission, read into and made a part of the record of this, the second hearing, and again certified and transmitted the whole thereof to us for review.
If our ruling on the first hearing was right, as I think *Page 314 
it was, and there being no substantial difference in the evidence of the two hearings as to the ground on which the award was annulled, our first ruling, though by a divided court, should be adhered to and not overthrown. If the applicant is entitled to the award now made, he was entitled to it on the first hearing. If he was not entitled to it then, because, as we held, of his refusal to permit proper treatment, he is not entitled to it now, for the evidence as to such refusal and the effect thereof is the same on the second as on the first hearing. Though it be assumed that on either hearing was he entitled to compensation for the loss or dis-for the injury sustained by him, yet it is clear that on neither hearing was he entitled to compensation for the loss or disability which resulted from his willful refusal to be properly treated and for which he claimed and was awarded compensation. I therefore am of the opinion that the award should again be annulled.